## Richmond.

CHESAPEAKE WESTERN RAILWAY v. SHIFLETT'S
ADMINISTRATRIX.

November 11, 1915.

Absent, Keith, P.

1. NEGLIGENCE—*Case at Bar.*—The evidence in the case at bar does not sustain any charge of negligence alleged in the declaration against the defendant.
2. MASTER AND SERVANT—*Injury to Servant—Dangers Known to Servant—Warning—Negligence—Case at Bar.*—No duty rests upon the master to warn his servant of what he already knows is going to happen. In the case at bar, an experienced track man, having no duty to perform in connection with poling a car, and nothing to do except to take care of himself, was thrice told of his danger, was familiar with the conditions surrounding him, and was in a position to see, and must have seen, practically everything that was taking place, hence there was no need to ring a bell, sound a whistle, or otherwise to warn him of danger, and it was not negligence to fail to do so.
3. LAST CLEAR CHANCE—*When Doctrine Not Applicable.*—The doctrine of last clear chance has no application to the case where, after the peril of another was, or should have been discovered, the time and opportunity available were such that the mental and physical faculties would have had to act with more than human precision and with the quickness of electricity to have avoided its consequences.
4. APPEAL AND ERROR—*Verdict—Without Evidence to Support.*—The verdict of a jury cannot be set aside by the appellate court unless it is plainly without evidence to support it, and this is especially true in cases based on charges of negligence, but a verdict will not be allowed to stand which has mere conjecture and speculation to support it.
5. MASTER AND SERVANT—*Federal Employers' Liability Act—Primary Negligence of Defendant.*—Primary negligence on the part of the defendant is essential to sustain an action under the Federal employers' liability act, and without it no action will lie.

Error to a judgment of the Circuit Court of Rockingham county in an action of trespass on the case. Judgment for the plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*D. O. Dechert* and *J. B. Stephenson,* for the plaintiff in error.

*John Paul* and *Charles A. Hammer,* for the defendant in error.

KELLY, J., delivered the opinion of the court.

This action was brought by the administratrix of John Shiflett to recover of the defendant railway company damages for the alleged negligent killing of her intestate. There was a judgment for $2,000, to which this writ of error was awarded.

The facts which, as we conceive, are essential to a proper understanding and disposition of the case are as follows: The plaintiff's intestate was at the time of the accident which resulted in his death, and had been for a number of years prior thereto, employed by the appellant as a section foreman. Immediately preceding the accident, he had been directing the section hands under him in the work of replacing on a side track at Elkton a car of coal which had been derailed. This work had been suspended for the day, and Shiflett, after perhaps having visited a nearby tool house, walked along between the side track and the main track, parallel thereto, to a point where an engine, which had just been detached from a freight train, and which was accompanied by the engineer and fireman and two other employees designated as the front and rear brakeman, respectively, was about to be used in an operation known in railroad parlance as "poling" a car of logs out of the siding through the switch to the main line.

This operation is common in railroad yards and was one .with which Shiflett was familiar. The distance between the main line and the side track was six feet and nine inches. The car of logs was on the side track about one hundred yards from the switch through which it was to pass, and it was the only car on the side track except the derailed car above mentioned, which was some distance away at the extreme end (a dead end) of the side track in the opposite direction from the switch. The operation of "poling" was accomplished by placing a pole, seven feet three inches in length, diagonally across the space between the tracks, about four feet above the ground, one end resting against a corner of the tender and the other against a corner of the car, the engine coming back slowly until the pole became taut, then accelerating the speed for a short distance and stopping abruptly, allowing the pole to drop out and the car to roll on under the momentum thus imparted until slowed up or stopped at the proper place by the brakeman in charge. The engine in such cases is always stopped quickly to avoid danger from the pole, which, when released, falls beside the engine and is liable to get under the wheels.

Going now a little more into details, when Shiflett arrived on the scene the engine was standing still. It had passed the log car and had stopped far enough beyond it. (east of it) to leave room between the corner of the tender and the corner of the car for one of the brakemen to place the pole in position. As Shiflett approached, walking between the tracks and along on the fireman's side of the engine, the fireman, after having some conversation with him about the derailed car, told him to get out of the way as they were going to pole the log car. Shiflett replied, "All right, I'll get out of the way." At that time the front brakeman was trying, under some difficulty, to get the pole loose from the side of the tender, and he too warned Shiflett not to go in between the engine and the car. He passed on, however, by the front brakeman, who by that time had succeeded in getting the pole loose from the tender and was

holding it in his arms ready to place it, and who called out to him, "Look out, John; this pole will hit you if you go down in there;" to which Shiflett replied, "I see the pole," and then proceeded to the rear, or west, end of the log car, where he took his stand with one foot on the rail and one arm on the end sill of the car, and engaged the rear brakeman, who was on the car, in a conversation about the derailed car, telling him not to hit it (a wholly idle and useless warning since Shiflett had already been twice told that the only other car on the side track, this log car, was to be at once poled out in the opposite direction). Here again he was told by this third member of the train crew, the rear brakeman, to get out of the way and replied in substance that he would take care of himself. Two or three steps across the side track or four or five steps the other way across the main line would have taken him to a place of absolute safety. The presumption, of course, was that he would do as he had said and take care of himself. The rear brakeman then started back over the car of logs to be in position to control the brakes at the opposite end, and when he was about the middle of the car he observed that Shiflett was walking in the same direction, about opposite him, down in the space between the tracks alongside the car, and facing the rear of the tender, which was then slowly moving toward him and starting the car in motion. The car was forty feet long, and Shiflett was, therefore, at that time approximately twenty feet from the rear of the tender—slightly more than twenty feet, allowing something for the space occupied by the pole between the tender and the car. The rear brakeman, seeing him in this position, called to him to "look out." There were even then two means of escape open still to him—one, to stoop and allow the pole to pass over him (the front brakeman having stepped out of the way behind the car as soon as the pole was tight) and the other to go straight across the track in front of the tender. There was time and opportunity for his escape either way. He did step over on the main line behind the tender, but

instead of going straight across, he seems to have become
bewildered, and, turning, he walked rather slowly for several
steps down the track, with his back to the approaching tender,
until he was struck and killed.   The engineer, who had seen
him some fifty feet ahead of the engine coming down between
the tracks, did not, and could not by reason of his position on the
right side of the engine, see him again until after he was struck
by the tender.  The fireman could not see him after he passed
around the west end of the log car to talk to the rear brakeman,
until he stepped back into the space between the tracks, and did
not see him then because at that moment his attention was fixed,
as his duty required, on the front brakeman and his movements
with the pole.   For a similar reason the front brakeman, busy
with the pole, could not see him around the end of the car and
did not see him when he stepped back between the tracks.
With practical simultaneousness, however, the front and rear
brakeman and the fireman all saw him step on the track in front
of the tender, for this movement on his part followed almost
immediately upon the last above-mentioned warning to him by
the rear brakeman to "look out."   At that moment both brake-
men called to him to get out of the way, and both called out
"that will do," which, in this sort of operation, is equivalent
to a call for an emergency stop of the engine, and the
fireman passed the signal on at once to the engineer, who
stopped the engine as quickly as possible.   The fireman says
he did not think the man would get across, but that he gave the
emergency signal, not for that reason, but because he got it
from the front brakeman.   This statement on his part is relied
upon by appellee as evidence of negligence.   It is clear, how-
ever, that there was no appreciable time between his seeing the
man's position and his hearing the brakeman's call, "that will
do," and the result is not affected by the fact that he attributes
his action to the signal rather than to the movement of Shiflett.
If he had time to think at all between the moment when Shiflett
stepped on the track and the moment when he heard the brake-

man's signal, or if he thought as rapidly as the defendant in error contends he should have thought, he would have been justified in thinking that the brakeman knew better than he did whether Shiflett could get ahead. As a matter of fact, his belief that Shiflett did not have time to make his escape was not correct. That he did have time, and that the engine was stopped in time to save him if he had gone on across, is clearly shown by the testimony of the two brakemen, and of C. L. Gooden, a disinterested bystander, all of whom were in a better position than the fireman was to see Shiflett's situation. It is true that the engineer says he did not observe anything unusual in the manner in which the signal to stop was given him, and that he did not know Shiflett was in the way until after he had struck him; but it also appears, without contradiction, that the signal he got was the emergency signal, and that he knew of no other signal that would have been more effective.

It appeared, and the fact was stressed by the defendant in error, that the conductor in general charge of the crew was not in the position which, under the railway company's rules, he was required to take during a switching operation; the contention being that if he had been so stationed he would have been in the engineer's line of vision and might have given him a signal to stop. We think there is no force in this contention. The engineer was looking, as he should have been, during this particular operation, to his fireman for the proper signals. The conductor was taking no part in the particular movement then in progress, and, if he had been on the opposite side of the track, where it was contended he should have been, he would still have been over one hundred yards away and in a direction in which it would have been both improper and unsafe for the engineer to be looking.

It further appears, and is likewise stressed by the defendant in error, that the engine attained a speed of eight or ten miles an hour and ran a distance of about eighty feet, and that there was evidence tending to show that this was unnecessary and, on

other roads, unusual, in poling a car situated as this one was. It nowhere appears, however, that there was any essential danger in making such a speed, or in traversing such a distance. Upon the contrary, there was affirmative proof that the operation was safe in itself, as conducted that day, and was in all substantial respects the same as it usually was on this side track, where the decedent had frequently seen it done. The evidence does not sustain any charge of negligence based on the rate of speed or the distance traversed by the engine.

The question as to whether the bell was wrung or the whistle sounded seems to us wholly immaterial. Shiflett was an experienced track man. He was thoroughly familiar with the general conditions surrounding him, and had not only been thrice told, but was in a position to see and must have seen, practically everything that was taking place. He had no duty whatever to perform in connection with the operation, and nothing at all to do except to take care of himself. The authorities hereinafter cited clearly show there is no duty upon an employer to warn his employees as to what they already know is going to happen.

The foregoing statement, we think, fairly shows the situation of the parties and the circumstances under which the accident occurred. Our conclusion is that, until the moment when Shiflett's unaccountable actions showed that he was not going to save himself, the defendant's other employees had the right to assume that he would not be hurt, and that thereafter they did all that could be required of them in an effort to prevent the accident. That he had time to pass on across the main track, even after he stepped between the rails, is placed beyond debate by the evidence. His opportunity then to save himself was still open and obvious, as shown by the testimony of witnesses having a clear view of the situation. His chance to save himself was much better than the chance of those in charge of the operation. The doctrine of the last clear chance does not come into the case at all. What happened after he

changed his course, faced about and walked down, instead of across, the track involved the movement of the engine for a distance of less than forty feet of track and the lapse of less than three seconds of time, allowing the shortest time and distance that would necessarily have been required after his peril was, or should have been, discovered for the signals to be given and reach the engineer and for him to apply the brakes, it is clear that the mental and physical faculties of the other men would have had to act with more than human precision, and with the quickness of electricity, to utilize the scant time and distance thus remaining in saving this man from the wholly unexpected and unlikely emergency which his inexplicable conduct had precipitated. If they had succeeded, it would have been by the merest chance. The law does not impose liability under such circumstances. As was suggetsed by Judge Keith in *Norfolk Southern R. Co.* v. *White's Admx.,* 117 Va. 342, 84 S. E. 646, "the minds, nerves and muscles of men are not so accurately co-ordinated as that there can be instantaneous action to meet an emergency."

In support of the conclusion that the defendant's employees had the legal right to presume that Shiflett would look out for himself, that they owed him, under the circumstances, no duty of prevision, and were not negligent in failing, if they did fail, to ring the bell or give other signals before and while backing the engine, the following authorities would seem to be entirely decisive: *N. & W. Ry. Co.* v. *Belcher,* 107 Va. 340, 58 S. E. 579; *Pittard* v. *Southern Ry. Co.,* 107 Va. 1, 57 S. E. 561; *Aerkfetz* v. *Humphreys,* 145 U. S. 418, 12 Sup. Ct. 835, 36 L. Ed. 758; 3 Elliott on Railroads, sec. 1258.

It is settled law, steadfastly recognized and followed by this court, that the verdict of a jury must not be set aside unless it is plainly without evidence to support it. This rule applies, perhaps, with peculiar force to cases based upon charges of negligence. The facts disclosed in the record before us, however, in our opinion, bring this case, not within the inhibition,

but within the exception to the rule. A demand for damages for an alleged wrongful act does not reach the province of the jury, "if there is no evidence of negligence, or if the evidence only suggests the possibility of negligence, or is as consistent with the absence of all negligence as with its existence. The court has no right to allow the jury to act upon a 'mere surmise or conjecture.' " 1 Shear. & Red. on Neg. (6th Ed.), sec. 56, p. 116. See also 6 Thomp. Neg., sec. 7391, and the cases cited under both of these references.

In the present case it may very properly be said, as in *N. & W. R. Co.* v. *Belcher, supra,* that "the theory that the accident might have been avoided is a matter of the merest conjecture and speculation."

Having decided that the evidence fails to show any primary negligence upon the part of the railway company, it becomes unnecessary to consider the further question, so earnestly discussed by counsel, whether the relationship of plaintiff's intestate was such at the time of the accident as to entitle him to maintain his action under the Federal employers' liability act. Manifestly there could be no recovery except under that act, since otherwise the decedent's own negligence would bar the claim. But primary negligence is, of course, essential under the Federal act, and, therefore, in the view held by us, there can be no recovery whether the act applies or not.

There was also a number of other questions relating to the admission of evidence and the instructions to the jury, which may not arise upon another trial, if one is had, and which we deem it unnecessary to pass upon at this time.

The motion to set aside the verdict as contrary to the law and the evidence ought, in our opinion, to have been sustained, and the judgment complained of will, therefore, be reversed and the cause remanded for a new trial to be had not in conflict with the views herein expressed.

*Reversed.*